IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF    )       Case No.
FORD EXPEDITION                   )
MD LICENSE NUMBER, M933914        )
VIN – 1FMPU14W04LB60855           )       UNDER SEAL

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Cynthia Paige Pinson, being duly sworn and deposed, state the following:

1.      I have been a Special Agent with the Federal Bureau of Investigation (FBI) for over three years.  I have investigated numerous intellectual property crimes.  I am currently assigned to the Washington Field Office Computer Crimes Squad.  Our squad's primary mission is to investigate both intellectual property crimes and crimes utilizing the exploitation of emerging technologies to defraud United States industries and consumers.  I have received training in general law enforcement and in specialized areas including computer, intellectual property and other white-collar crimes.  In addition, I hold a Bachelor's degree in industrial engineering from the Georgia Institute of Technology (Georgia Tech) and a Master's degree in business administration from Georgia State University.  I have worked with the computer security center within Georgia Tech, and I have taught numerous courses involving internet software.

2.      The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during my participation in this investigation, knowledge obtained from other individuals including other law enforcement personnel, representatives from the Motion Picture Association of America (MPAA), representatives from the Recording Industry Association of America (RIAA), representatives from Blazer Investigations who have received extensive training in the recognition of counterfeit goods from the manufacturers of trademarked goods including the National Football

League, review of documents and computer records related to this investigation, communications

with others who have personal knowledge of the events and circumstances described herein, and

information gained through my training and experience.

3.      I make this affidavit to establish probable cause in support of an application by the United

States of America for the issuance of a warrant to search a vehicle described as a Ford Expedition,

Maryland license plate number M933914, vehicle identification number 1FMPU14W04LB60855,

as more particularly described in Attachment A of this affidavit, hereby incorporated by reference,

for the items described in Attachment B of this affidavit, hereby also incorporated by reference,

which constitute evidence, contraband, fruits, or instrumentalities of violations of criminal

conspiracy and counterfeit goods trafficking laws, namely, Title 18, United States Code, Sections

371 and 2320.

4.      Because this affidavit is submitted for the limited purpose of establishing probable cause in

support of the application for a search warrant this affidavit does not set forth each and every fact

I learned during the course of this investigation.

## I. RELEVANT CODE SECTIONS

5.      Title 18, United States Code, Sections 371 and 2320 provide in pertinent part:

Section 371:
If two or more persons conspire ... to commit any offense against the United States
... and one or more of such persons do any act to effect the object of the conspiracy,
each shall be fined under this title or imprisoned not more than five years, or both.

Section 2320:
(a)      Whoever intentionally traffics or attempts to traffic in goods or services and
knowingly uses a counterfeit mark on or in connection with such goods or services
shall, if an individual, be fined not more than $2,000,000 or imprisoned not more
than 10 years, or both, and, if a person other than an individual, be fined not more
than $5,000,000.

**(b)**    Upon a determination by a preponderance of the evidence that any articles in the possession of a defendant in a prosecution under this section bear counterfeit marks, the United States may obtain an order for the destruction of such articles.

**... (e)**  For the purposes of this section –
>    **(1)**    the term "counterfeit mark" means –
>>        **(A)**    a spurious mark
>>>            **(i)**    that is used in connection with trafficking in goods or services;
>>>            **(ii)**    that is identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register in the United States Patent and Trademark Office and in use, whether or not the defendant knew such mark was so registered; and
>>>            **(iii)**    the use of which is likely to cause confusion, to cause mistake, or to deceive. . . .
>    **(2)**    the term "traffic" means transport, transfer, or otherwise dispose of, to another, as consideration for anything of value, or make or obtain control of with intent to so transport, transfer, or dispose of. . . .

## II.  COMPLAINT TO THE WASHINGTON METROPOLITAN POLICE DEPARTMENT

6.    On April 13, 2005, officers from the Washington, D.C., Metropolitan Police Department (MPD) received a complaint from investigators for the RIAA and the MPAA regarding the unauthorized sale of music CDs and movie DVDs that contained deceptive labeling in violation of Title 22, D.C. Code, Section 3214.01 (2004 edition).

7.    The investigators from the RIAA and MPAA advised the MPD officers that an individual named "CHARLIE" was offering these unauthorized music CDs and movie DVDs for sale from a warehouse located at 1225 4th Street, N.E., Washington, D.C.

8.    Prior surveillance conducted by the RIAA and MPAA investigators showed numerous individuals exiting the warehouse located at 1225 4th Street, N.E., Washington, D.C., in possession of what appeared to be unauthorized replications of copyrighted music CDs and movie DVDs.

3

### III.  **MPD CONTROLLED PURCHASE**

9.      Because of the MPAA and RIAA complaints, on April 19, 2005, officers from the MPD

acting in an undercover capacity purchased motion picture DVDs from CHARLIE.

10.     During the purchase, a MPD undercover officer entered the warehouse located at 1225 4th

Street, N.E., Washington, D.C., and asked the clerk for motion picture DVDs.  The clerk then

produced three (3) adult motion picture DVDs and advised the MPD undercover officer they were

each priced at $3.00.

11.     The MPD undercover officer then produced a $20.00 bill and presented it to the clerk, who

advised the MPD officer to receive change from an individual named "CHARLIE," an Asian male

approximately 45 years of age, subsequently identified as QIYAO YUAN, residing at 7608 Kidmore

Lane, Lanham, Maryland (hereinafter "YUAN").   YUAN then presented $11.00 to the MPD

undercover officer.

12.      The MPD officer inquired as to the sale of non-pornographic motion picture DVDs and was

advised by the clerk to return the following day after six o'clock p.m.

13.     Before exiting the warehouse, the MPD officer observed YUAN sell five (5) motion picture

DVDs, including one labeled "B-COOL," to another customer inside the warehouse.  The MPD

undercover officer recognized this motion picture DVD to be a title in current theatrical release, not

yet available for sale to the public.

### IV. **MPD SEARCH WARRANT**

14.     On April 20, 2005, officers from the MPD executed a search warrant issued by a judicial

officer of the District of Columbia Superior Court, at 1225 4th Street, N.E., Washington, D.C. 20002.

15.     During the course of this search, MPD officers seized over 16,000 motion picture DVDs

containing apparent counterfeit marks, 20 illegal audio CDs containing apparent counterfeit marks, hundreds of empty DVD cases and motion picture labels for being placed inside these DVD cases.

16.    Along with others, YUAN and PING CHEN were arrested by MPD officers pursuant to Title 22, D.C. Code, Section 3214.01 (2004 edition).

17.    Officers also seized business records during the execution of the search warrant that associate YUAN with the business, YY ENTERPRISES, INC.

18.    Business records seized during the execution of the search warrant show YY ENTERPRISES, INC. as an occupant for the premises located at 1225 4th Street, N.E., Washington, D.C.

19.    In addition, near the entrance of 1225 4th Street, N.E., Washington, D.C., the words, "CHARLIE'S Y.Y", are spray-painted in white letters on the side of the building.

### V.    FBI INVESTIGATION AND UNDERCOVER PURCHASES

20.    The FBI was contacted by MPD regarding the results of the MPD search warrant executed at 1225 4th Street, N.E., Washington, D.C. on April 20, 2005.

21.    A Confidential Informant (CI) of known reliability informed the FBI that YUAN continued to sell copyrighted works after his arrest.

22.    CI has provided information in previous investigations that has been established as having been true.  CI has never provided any information that was found to be false  or misleading.

23.    As the FBI investigated possible federal criminal violations, on May 23, 2005, the criminal complaint based on D.C. Code charges was dismissed in the District of Columbia Superior Court.

24.    Subsequently, undercover purchases were made from YUAN using an undercover MPD officer, FBI and MPD pre-recorded funds, and personnel from the FBI and MPD.  Each item

purchased was later inspected by an industry expert and found to contain counterfeit marks on the work and/or the packaging sold with the work, that is, spurious marks that are unauthorized copies of marks registered on the principal register in the United States Patent and Trademark Office and are in use.

### A. June 22, 2005 Undercover Purchase

25.    On June 22, 2005, an undercover purchase was made using $280.00 in pre-recorded FBI funds for the purchase of motion picture DVDs.

26.    During this transaction, an undercover MPD officer entered the premises located at 1225 4th Street, N.E., Washington, D.C., and met with a female, approximately aged in her twenties who referred to herself as CECILIA, regarding the purchase of motion picture DVDs.  CECILIA was subsequently identified as CECILIA G. RODRIGUEZ (hereinafter "CECILIA").

27.    CECILIA provided a list to the undercover MPD officer that contained motion picture titles in current theatrical release, not yet available for sale to the general public.

28.    After presenting CECILIA with $280.00, the undercover MPD officer was given DVD cases by CECILIA and told to meet CECILIA behind the Burger King restaurant located at 3rd Street and Florida Avenue, N.E., where the undercover MPD officer would then receive the DVDs and artwork inserts for the titles purchased.

29.    CECILIA called the undercover MPD officer and requested they meet at the liquor store across the street since a police vehicle was located in the Burger King restaurant parking lot.  The MPD undercover officer agreed, and CECILIA arrived in the parking lot of the liquor store driving a Toyota vehicle, tan in color, bearing Maryland license plates.  CECILIA retrieved a black bag containing movie DVDs from the front passenger seat of the vehicle and presented them to the

undercover MPD officer.

30.     The vehicle driven by CECILIA was later observed outside 1225 4th Street, N.E., and bore

the Maryland license plate number 5ATE05.  Maryland registration information indicated that this

vehicle is registered to CECILIA G. RODRIGUEZ of 41 Stonegate Drive, Silver Spring, Maryland.

### B. October 14, 2005 Undercover Purchase

31.     On October 14, 2005, an undercover purchase was made using $260.00 in pre-recorded FBI

funds for 100 motion picture DVDs.

32.     During this transaction, an undercover MPD officer and CI entered the premises  located at

1225 4th Street, N.E., Washington, D.C., and spoke with YUAN and an Asian female, who was aged

approximately in her forties and known as CHEN, regarding the purchase of motion picture DVDs.

CHEN was subsequently identified as PING CHEN (hereinafter "CHEN").

33.     CHEN presented a list of movie titles to the undercover MPD officer and CI and stated that

movie titles were sold in multiples of five.  Later, CHEN and CECILIA, packaged the DVDs inside

the premises.

34.     The list provided to the undercover MPD officer and CI contained motion pictures in current

theatrical release, not yet available for sale on DVD to the general public.

35.     After choosing titles, the undercover MPD officer then asked YUAN for the total of the

purchase and presented YUAN with $260.00.

36.     After stating that DVD cases were needed, YUAN retrieved a box containing empty DVD

cases and presented it to the undercover MPD officer.

37.     During the transaction, the undercover MPD officer and CI purchased the following motion

pictures and sound recordings titles:

| DESCRIPTION | QUANTITY |
|---|---|
| 1. Flight Plan | 20 DVDs |
| 2. The Gospel | 25 DVDs |
| 3. Green Street Hooligans | 5 DVDs |
| 4. A History of Violence | 5 DVDs |
| 5. The Exorcism of Emily Rose | 5 DVDs |
| 6. Two For the Money | 15 DVDs |
| 7. Venom | 5 DVDs |
| 8. G | 5 DVDs |
| 9. Beef | 5 DVDs |
| 10. Best of Mike Jones and Slim Thug Young Jeezy & Juelz Santana | 10 DVDs |

**C. October 21, 2005 Undercover Purchase**

38.    On October 21, 2005, an undercover purchase was made using $320.00 in pre-recorded FBI and MPD funds for 100 motion picture DVDs and one pair of Timberland boots.

39.    Prior to the transaction, the undercover MPD officer approached 1225 4th Street, N.E., Washington, D.C., and met YUAN, who was outside the premises.

40.    After engaging YUAN in conversation regarding the purchase of motion picture DVDs, YUAN and the undercover MPD officer entered 1225 4th Street, N.E., Washington, D.C.

41.    Once inside the premises, YUAN inquired as to whether the undercover MPD officer's purchase quantity would be the same as that purchased on 10/14/2005, 100 DVDs, and the undercover MPD officer answered in the affirmative.

42.    YUAN then directed CHEN to provide the undercover MPD officer the same quantity ordered previously.

43.    CHEN provided a list to the undercover MPD officer that contained motion pictures in current theatrical release, not yet available for sale on DVD to the general public.

44.    After choosing the following movie titles and quantities, the undercover MPD officer

received a box containing 100 empty DVD cases from YUAN.

| DESCRIPTION | QUANTITY |
|---|---|
| 1. The Exorcism of Emily Rose | 5 DVDs |
| 2. The Gospel | 5 DVDs |
| 3. Hustle & Flow | 5 DVDs |
| 4. G | 10 DVDs |
| 5. Into the Blue | 5 DVDs |
| 6. A History of Violence | 5 DVDs |
| 7. The Marksman | 5 DVDs |
| 8. Carlito's Way | 5 DVDs |
| 9. Hostile Takedown | 5 DVDs |
| 10. Unleashed | 10 DVDs |
| 11. Domino | 10 DVDs |
| 12. The Man | 10 DVDs |
| 13. The Fog | 11 DVDs |
| 14. Dirty Shield | 5 DVDs |
| 15. The Animal | 5 DVDs |
| 16. Booty Talk 49 | 1 DVD |

45.     The undercover MPD officer presented YUAN with $260.00 in FBI and MPD pre-recorded funds and YUAN indicated that he also had Timberland boots and Airforce One shoes for sale.

46.     The undercover MPD officer presented YUAN with $60.00 and was given a pair of Timberland boots by an unknown male.

47.     YUAN indicated he was in a hurry and directed the undercover MPD officer to leave a telephone number with CHEN for future ordering purposes.

**D. October 28, 2005 Undercover Purchase**

48.     On October 28, 2005, an undercover purchase was made using $260.00 in pre-recorded FBI funds for 100 motion picture DVDs and $100.00 in MPD pre-recorded funds for the purchase of three Washington Redskin National Football League (NFL) jerseys.

49.     During this transaction, an undercover MPD officer entered the premises located at 1225 4th Street, N.E., Washington, D.C., and spoke with YUAN regarding the purchase of motion picture

9

DVDs and inquired which new movie titles were available.

50.    YUAN asked if the undercover MPD officer's order quantity would be the same then directed CHEN to provide the DVDs to the undercover MPD officer.  The following is a list of movie titles and quantities provided to the undercover MPD officer by CHEN:

| DESCRIPTION | QUANTITY |
|---|---|
| 1. Flightplan | 5  DVDs |
| 2. Doom | 5  DVDs |
| 3. Shooting Gallery | 10  DVDs |
| 4. Stay | 10  DVDs |
| 5. North Country | 10  DVDs |
| 6. Dave Chappelle Live at the Fillmore | 5  DVDs |
| 7. Four Brothers | 5  DVDs |
| 8. Holier Than Thou | 5  DVDs |
| 9. Two For the Money | 5  DVDs |
| 10. Critical Assignment | 5  DVDs |
| 11. Dirty Shield | 5  DVDs |
| 12. The Prophesy Forsaken | 5  DVDs |
| 13. Today You Die | 5  DVDs |
| 14. Domino | 5  DVDs |
| 15. The Fog | 5  DVDs |
| 16. Unleashed | 5  DVDs |
| 17. The Gospel | 5  DVDs |

51.    While CHEN accumulated the order, YUAN advised the undercover MPD officer that he had NFL jerseys available for sale.  The undercover MPD officer inquired as to the price for three of the jerseys and YUAN advised that the cost would be $100.00.

52.    The undercover MPD officer provided $100.00 in pre-recorded MPD funds to YUAN and he then handed three of the Washington Redskins jerseys to the undercover MPD officer.

**E.        November 10, 2005, Undercover Purchase and Search
          and Arrest Warrant Executions**

53.    On November 10, 2005, investigators executed a federal search warrant upon the premises of YY ENTERPRISES, INC., 1225 4th Street, N.E., Washington, D.C., and also executed a federal

arrest warrant for YUAN, among others.  Prior to the warrant executions, another undercover purchase was made for motion picture DVDs from CHEN inside YY ENTERPRISES.  During the undercover purchase, investigators observed YUAN leave the premises of YY ENTERPRISES and drive away in a red Ford Expedition, Maryland license plate number M933914, vehicle identification number 1FMPU14W04LB60855, registered to Jun Yang, 7608 Kidmore Lane, Lanham, Maryland, which is also YUAN's home address.  A look out was broadcast to other Officers, to effect YUAN's arrest pursuant to the arrest warrant, and a short time later YUAN and the red, Ford Expedition, Maryland license plate number M933914, vehicle identification number 1FMPU14W04LB60855, were observed by a Police Officer at 4th Street and Pennsylvania Avenue, N.E., Washington, D.C. The Officer stopped YUAN's vehicle and placed YUAN under arrest.  The Officer observed YUAN making furtive gestures inside the vehicle until he was ordered to exit it, and the Officer observed inside the vehicle, through a window, numerous DVDs on the front seat in cases during the arrest. The vehicle was towed to an FBI garage, located on V Street, N.E., Washington, D.C., and secured until a federal search warrant could be obtained authorizing the vehicle's search.

54.    During the execution of the search warrant upon the premises of YY ENTERPRISES, thousands of counterfeit and pirated movie DVDs and music CDs, among other things,  were seized from the location.

## VI.    EXAMINATION OF UNDERCOVER PURCHASES AND SEARCH WARRANT SEIZURES

55.    All items purchased during each undercover purchase and seized during the search warrant execution, described above, were inspected by industry experts who have received extensive training in the recognition of counterfeit goods from the manufacturers of trademarked goods, and who have

experience assisting Federal and State law enforcement agencies in the detection of counterfeit goods.

56.    Each item described above as purchased by the undercover officer or seized during the search warrant execution, including movies, sound recordings, and NFL jerseys, and later inspected by an industry expert was found to contain counterfeit marks on the work and/or the packaging sold with the work, that is, spurious marks that are unauthorized copies of marks registered on the principal register in the United States Patent and Trademark Office and are in use.

## VII.  EVIDENCE, CONTRABAND, FRUITS AND INSTRUMENTALITIES OF CRIME

57.    Based upon your affiant's training and experience, upon my participation in investigations of other illegal enterprises engaged in violations of narcotics laws, IRS laws, the Money Laundering Control Act, and related offenses, and upon the training and experience of other investigators participating in this investigation, including, but not limited to, that of Detective Edward Doyle, I know that:

a.    It is common for individuals involved in financial crime, including trafficking in counterfeit goods offenses, to maintain financial documents and records relating to both their personal and business financial affairs.  These documents will show their acquisition, conversion, movement, secreting, transfer, and disbursement of currency, currency equivalents, and illegal goods, including counterfeit goods.  It is also common for such persons to maintain currency, checks, money orders, credit cards, credit card receipts, or other financial instruments which are the proceeds or facilitating property of the illegal activity.  These documents, records, and financial instruments are often retained for long periods of time in secure and accessible locations, including residences, businesses, vehicles, safe deposit boxes, banks, and storage facilities;

b.   In the case of an illegal business enterprise like YY ENTERPRISES, such financial documents and records often include inventory ledgers; purchase orders; confirmation letters; correspondence with co-conspirators; payment or disbursement ledgers; computer documents and/or files; invoices; employee lists and employment information; employee sales records; supplier and delivery records; receipts relating to illegal sales and to the expenditure of proceeds of illegal activities; U.S. Postal Service and/or next day carrier services documents and receipts; supplier, customer and/or co-conspirator telephone number and address listings; customer records; contracts; Rolodex files; photographs and other forms of identification of associates and co-conspirators; appointment books; notes; airline ticket receipts; records of money orders; bank accounts; and financial instruments.  All of the foregoing items and information constitute evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 and 2320.

c.   Individuals involved in financial crime, including trafficking in counterfeit goods, create such documents, records, and information by various means, including, but not limited to, computers, printers, telex machines, facsimile machines, currency counting machines, pagers (digital display beepers), and telephones, telephone answering machines, and cameras.  These individuals also maintain such documents, records, and information in various forms, including, but not limited to, electrical, magnetic, photographic, and tangible form.  The warrant application therefore requests authorization to search for and seize all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including hard drives, floppy diskettes, ZIP discs, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants such as Palm Pilot computers, as well

13

as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

58.    Your affiant also knows that computer hardware and software, and digitally, electronically, and magnetically stored files and information may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data.  Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware and software, and digitally, electronically, and magnetically stored files and information that are evidence of crime, contraband, instrumentalities of crime, or fruits of crime.  In this case, the warrant application requests permission to search and seize all computer hardware and software, and digitally, electronically, and magnetically stored files and information within the Ford Expedition that constitute or may be contraband, and that constitute or may be evidence, instrumentalities, or fruits of violations, by YY ENTERPRISES and its owners or agents, of counterfeiting offenses involving Title 18, United States Code, Sections 371 and 2320.  Based on all of the foregoing facts, your affiant believes that, in this case, computer hardware and software, and digitally, electronically, and magnetically stored files and information within the Ford Expedition constitute evidence, instrumentalities, or fruits of crime.

59.    Individuals involved in the sale of counterfeit products, such as CDs, DVDs, watches, handbags, luggage and other wearing apparel and commodities often sell their product from stores rented by them or from kiosks located in suburban shopping malls.  Often times, they have the

14

counterfeit goods shipped to their residence via commercial shippers and then remove the merchandise from the original shipping boxes and containers and transport it to their place of business where it is sold on the open market. Individuals involved in the sale of counterfeit products often hide and safeguard contraband by storing their inventory in residences and storage facilities located away from their primary business. Records pertaining to the rental and lease of storage facilities used to hide and disguise contraband; records concerning the ordering, purchase, shipment, storage, inventory, payment and sale of counterfeit goods and apparel; records and documents reflecting the identity of co-conspirators and associates; and computer hardware and software, and computer storage devices, used to generate and store such records are frequently located at such individuals' residences where they are considered safe from theft, damage or discovery. Furthermore, individuals involved in the sale of counterfeit products often update and enter business data into their computers during after-work hours in the privacy of their residence, and they often conduct business transactions, including sending and receiving faxes, sending and receiving email or other forms of communication regarding the purchase, transportation or sale of counterfeit products from their residences after normal business hours due to the differences in world times zones with overseas suppliers, contacts and criminal associates.

60.     Individuals involved in the sale of counterfeit products commonly engage in tax evasion. Frequently business owners will maintain two sets of books, one recording all cash sales for their own information and one recording redacted cash sales figures. These monthly ledger sheets are often provided to bookkeepers and accountants who prepare quarterly sales tax payments on behalf of the business. Records detailing true sales figures are seldom kept at the business location. Rather, they are usually kept in office or computer areas in the business owners' residence.

15

61.    Individuals involved in the sale of counterfeit products commonly deal in large amounts of cash, much of which must be held in order to structure bank deposits under $10,000.  Often this surplus cash is kept in the business owner's residence rather than in an office safe in an unprotected store over night.  Individuals involved in financial crime also often use various money laundering schemes to dispose of their criminal proceeds and to facilitate their crimes.  They frequently co-mingle legitimate funds with illegitimate funds in an attempt to conceal and disguise their sources of income and they sometimes use a "nominee" or "straw purchaser" to purchase assets.

62.    The aforementioned facts provide evidence of probable cause to believe that the commercial retail distributor identified as YY ENTERPRISES, located at 1225 4th Street, NE., Washington, D.C., and its owners and agents, including but not limited to YUAN, CHEN, and CECILIA, have conspired to traffic and have intentionally trafficked in goods while knowingly using a counterfeit mark on or in connection with such goods, in violation of Title 18, United States Code, Sections 371 and 2320.  Additionally, there is probable cause to believe that evidence, instrumentalities, contraband, and fruits of those violations, as described above and more particularly described in Attachment B, will be found inside the Ford Expedition, Maryland license plate number M933914, vehicle identification number 1FMPU14W04LB60855, more particularly described in Attachment A.

63.    Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices.  I also know that during the search of the premises it is rarely possible to complete on-site examination of computer equipment and storage devices for a number of reasons, including the following:

16

a.  Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is rarely possible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.  The best practices for analysis of computer systems and storage media rely on rigorous procedures designed to maintain the integrity of the evidence and to recover "hidden," mislabeled, deceptively-named, erased, compressed, encrypted, or password-protected data while reducing the likelihood of inadvertent or intentional loss or modification of data.  A controlled environment, such as a law enforcement laboratory, is typically required to conduct such an analysis properly.

c.  The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  The hard drives commonly included in mere desktop computers are capable of storing millions of pages of text.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime.  This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

64.  In light of these concerns, your affiant hereby requests the Court's permission to seize the computer hardware, and associated peripherals as discussed below, that are believed to contain some or all of the contraband, evidence, instrumentalities or fruits of crime described in the warrant and

to conduct an off-site search of the hardware for such contraband, evidence, instrumentalities or fruits of crime if, upon arriving at the scene, the Agents executing the search conclude that it would be impractical to search the computer hardware on-site.

65.     Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in forensic examination of computers, I am aware that searches and seizures of evidence from computers taken from the premises commonly require agents to seize most or all of a computer system's input/output and peripheral devices, in order for a qualified computer expert accurately to retrieve the system's data in a laboratory or other controlled environment. Therefore, in those instances where computers are removed from the premises, in order fully to retrieve data from a computer system, investigators must seize all the storage devices, as well as the central processing units (CPUs), and applicable keyboards and monitors which are an integral part of the processing unit.  If, after inspecting the input/output devices, system software, and pertinent computer-related documentation, it becomes apparent that these items are no longer necessary to retrieve and preserve the data evidence, and are not otherwise seizeable, such materials and/or equipment will be returned within a reasonable time.

## VIII.  <u>ANALYSIS OF ELECTRONIC DATA</u>

66.     The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques.  Such techniques may include, but shall not be limited to, surveying various file directories and the individual files that they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence authorized for seizure by the warrant); examining all the structured, unstructured, deleted, and overwritten data on

18

a particular piece of media; opening or reading the first few pages of such files in order to determine their precise contents; scanning storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic key-word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

## IX.  CONCLUSION

67.    Based on the information set forth above, the undersigned affiant submits that there is probable cause to believe that evidence, contraband, fruits, and instrumentalities relating to violations of Title 18, United States Code, Sections 371 and 2320 are located and will be found within the Ford Expedition, Maryland license plate number M933914, vehicle identification number 1FMPU14W04LB60855.


_____
Cynthia Paige Pinson
Federal Bureau of Investigation
Special Agent


Sworn to before me and subscribed in my presence this _____ day of December 2005.


_____
United States Magistrate Judge
District of Columbia

**ATTACHMENT A**
**Place or Thing to be searched**

   An automobile described as a Ford Expedition, Maryland license plate number M933914, vehicle identification number 1FMPU14W04LB60855, located in the FBI garage, V Street, N.E., Washington, D.C.

**ATTACHMENT B**
**Items to be seized**

Items to be seized are the evidence, fruits, instrumentalities, or contraband relating to violations of Title 18, United States Code, Sections 371 and 2320, including but not limited to the following:

A.    <u>RECORDS</u>

1.    Records, documents, and materials containing information of past and present criminal activity involving trafficking or conspiring to traffic in goods while using a counterfeit mark on or in connection with such goods. The terms "records," "documents," and "materials" includes such items in all forms, including paper, photographic, mechanical, electronic, magnetic, and optical forms, or other coding forms on computer media or on media capable of being read by a computer or computer-related equipment, such as fixed hard discs, external hard discs, removable hard discs, floppy diskettes, compact discs (CDs), digital video discs (DVDs), tapes, optical storage devices, laser discs, electronic notebooks, zip disks, printer buffers, smart cards, or other memory storage devices, including cell phones.

2.    Records, documents, and materials that relate to the business of YY ENTERPRISES, to trafficking in counterfeit goods, or to QIYAO YUAN, PING CHEN, or CECILIA RODRIGUEZ, and that contain, constitute or concern inventory ledgers; purchase orders; confirmation letters; correspondence with co-conspirators; payment or disbursement ledgers; computer documents and/or files; invoices; employee lists and employment information; employee sales records; supplier and delivery records; receipts relating to illegal sales and to the expenditure of proceeds of illegal activities; U.S. Postal Service and/or next day carrier services documents and receipts; real estate and storage facility lease and title documents; supplier, customer and/or co-conspirator telephone or fax number and address listings; customer records; contracts; Rolodex files; keys; photographs and other forms of identification of associates and co-conspirators; appointment books; notes; and airline ticket receipts.

3.    Records, documents, and materials containing, constituting or concerning financial transactions, financial statements, and financial summaries; including bank statements; financial instruments; financial applications; wire transfer records; credit cards; credit card statements and records; ATM access cards; credit reports; social security cards; accounting records; money orders; checks; tax records; ledgers; and journals.

4.    Records, documents, and materials that relate to the business of YY ENTERPRISES, to trafficking in counterfeit goods, or to QIYAO YUAN, PING CHEN, or CECILIA RODRIGUEZ, and that contain, constitute or concern identification, foreign or domestic travel, or occupancy, residency, and ownership, such as driver's licenses; passports; visas; airline tickets; social security documents; mail; utility records; telephone records; and mortgages, deeds, and lien records.

B.    <u>HARDWARE</u>

5. Computer hardware, which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes any data-processing devices (such as central processing units, memory typewriters, Personal Data Assistants (PDAs), and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, removable magnetic disk storage drives and disks, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, and RAM or ROM units,); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

C.     SOFTWARE

6. Computer software consisting of digital information which can be interpreted by a computer and any of its related components to direct the way they work; in whatever form it may be found, to include: electronic, magnetic, optical, or other digital form, in addition to printed source code. Software includes, but is not limited to: any programs to run operating systems, control peripheral equipment, applications, utilities, scripts, compilers, interpreters, and communications programs; any programs, whether functional or not, to assist in the defeat of security/protective feature in place to prevent the unauthorized copying, distribution, and/or activation of software; along with any and all programs necessary for the proper functioning of this software.

D.     PASSWORDS, DATA SECURITY DEVICES, AND COMPUTER DOCUMENTATION

7. Computer passwords and other data security devices that are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital codes may include programming code that creates "test" keys or "hot" keys, which perform user-defined security-related functions when activated. Data security software or code which might also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unreadable as well as reverse the process to restore the data. Computer passwords may be stored in electronic media or written down on ledgers, books, papers, etc.

8. Computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use the computer hardware, software, or other related items.

E.     COUNTERFEIT GOODS AND RELATED EQUIPMENT, DEVICES AND MATERIALS

9. All apparel or other items, including but not limited to purses, handbags, wallets,

2

belts, scarfs, glasses, or hats that bear, or that appear to be possessed with the intent to affix, counterfeit marks; any unaffixed marks such as labels, logos, or identifying containers, documentation or packaging; and any tools, equipment, devices or materials for use in the manufacture, preparation, creation, or distribution of counterfeit goods or counterfeit marks.

3